**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

In re:

HAMILTON COVE TOWNHOUSES
PROPERTY OWNERS ASSOCIATION,
INC.,[1]

              Debtor.

Chapter 11, Subchapter V

Case No.: 4:26-bk-10479

**DECLARATION OF LADD MARKS IN SUPPORT OF DEBTOR'S CHAPTER 11**
**PETITION AND APPLICATIONS FOR FIRST DAY RELIEF**

      I, Ladd Marks, of full age, hereby certify and declare pursuant to Title 28 of the United States Code, Section 1746, as follows:

      1.     I am the President of the Board of Directors of Hamilton Cove Townhouses Property Owners Association, Inc. ("Debtor" or "Association").

      2.     I make this Declaration based on my personal knowledge, a review of records of Debtor, a review of documents publicly filed, and/or information available through counsel, agents and/or representatives of the Association.

      3.     I submit this Declaration to assist the Court and parties in interest in understanding the events and circumstances leading to the commencement of this case, and in support of the motions and other "first day" pleadings filed by Debtor (collectively, the "First Day Motions"),

---

[1] The last four digits of Debtor's tax identification number are 5663.

1

as set forth in more detail in Section M of this Declaration.[2] I am authorized to submit this Declaration on behalf of Debtor.

4.      If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

5.      On February 11, 2026 (the "Petition Date"), the Association filed a voluntary petition for relief pursuant to title 11 of the United States Code[3] (the "Bankruptcy Code"). Since the Petition Date, Debtor has remained in possession of its assets and has continued management of its property, business, and affairs.

**A.      History of the Association and Governing Documents.**

6.      The Association is a non-profit corporation organized under the laws of the State of Arkansas pursuant to Articles of Incorporation filed with the Secretary of State of the State of Arkansas on June 30, 1986 (the "Articles of Incorporation"). Pursuant to the Articles of Incorporation, the Association was organized *"[t]o operate, manage, lease, maintain and repair Units, replace furnishings and generally to administer the affairs of owners of Units and Unit Weeks within t h e Hamilton Cove Townhouses now platted or which may be platted with respect to the use of the Unit, occupancy of the Units and payment of expenses, and to have all those powers enumerated in the Supplemental Declaration of Covenants and Restrictions for the Hamilton Cove Townhouses of record or to be recorded in the Circuit Clerk and Ex-Officio Recorder's Office of Van Buren County, Arkansas."*

---

[2] The First Day Motions are filed jointly on behalf of Debtor, and four Other Associations (defined herein) at the Master Development (defined herein). The Other Associations are also debtors in bankruptcy cases pending before this Court.

3 All references to the "Bankruptcy Code" herein refer to 11 U.S.C. §§101-1532.

1605185568.9

7.     The original Bylaws for the Association were dated July 14, 1986. The Bylaws were amended on June 6, 2022 and recorded in the Circuit Clerk and Ex-Officio Recorder's Office for Van Buren County, Arkansas (the "Recorder's Office") on October 24, 2022 as Document number 2022-6607. The Bylaws as amended are referred to as the "Bylaws".

8.     Pursuant to the Bylaws, the Association is managed by a Board of Directors (the "Board" ). The current members of the Board are Ladd Marks, President; Jennifer Brown, Vice President; and Amy Moriarity, Secretary/Treasurer.

**B.     Property Structure.**

9.     The Association was formed pursuant to a Supplemental Declaration of Covenants and Restrictions for Hamilton Cove Townhouses dated July 14, 1986 recorded on July 15, 1986 as Document Number 86-3150 in the Recorder's Office ("Supplemental Declaration"). The Supplemental Declaration was amended by (i) that certain First Amendment to Supplemental Declaration of Covenants and Restrictions for Hamilton Cove Townhouses ("First Amendment") recorded on August 13, 1986 as Document Number 86-3707 in the Recorder's Office, (ii) that certain Supplemental Declaration to Declaration of Covenants and Restrictions and First Supplement to Supplemental Declaration of Covenants and Restrictions for Hamilton Cove Townhouses ("Supplemental Declaration and First Supplemental") recorded on March 4, 1987 as Document Number 87-882 in the Recorder's Office, (iii) that certain Supplemental Declaration to Declaration of Covenants and Restrictions and Second Supplement to Supplemental Declaration of Covenants and Restrictions for Hamilton Cove Townhouses Phase 3 ("Supplemental Declaration and Second Supplemental") recorded on May 5, 1988 as Document Number 88-2094 in the Recorder's Office, (iv) that certain Correction of Omission to Supplemental Declaration to Declaration of Covenants and Restrictions and Second Supplement to Supplemental Declaration of Covenants and Restrictions for Hamilton Cove Townhouses

3

Phase 3 ("Correction of Omission") recorded on July 1, 1988 as Document Number 88-2962 in the Recorder's Office, (v) that certain Supplemental Declaration of Declaration of Covenants and Restrictions and Third Supplement to Supplemental Declaration of Covenants and Restrictions for Hamilton Cove Townhouses, Phase 3, Replat ("Supplemental Declaration and Third Supplemental") recorded on November 7, 1988 as Document Number 88-4793 in the Recorder's Office, (vi) that certain First Amendment to Third Supplemental Declaration of Covenants and Restrictions for Hamilton Cove Townhouses, Phase 3, Second Replat ("First Amendment to Third Supplemental") recorded on January 27, 1989 as Document Number 89-414 in the Recorder's Office, and (vii) that certain Second Amendment and Fourth Supplemental Declaration to Supplemental Declaration of Covenants and Restrictions for Hamilton Cove Townhouses ("Second Amendment and Fourth Supplemental") recorded on July 11, 1989 as Document Number 89-3697 in the Recorder's Office. The Supplemental Declaration, First Amendment and Supplemental Declaration and First Supplemental Declaration, Supplemental Declaration and Second Supplemental, Correction of Omission, Supplemental Declaration and Third Supplemental, First Amendment to Third Supplemental, and the Second Amendment and Fourth Supplemental are collectively referred to as the "Declaration".

10.     The Declaration submits the property identified in the Declaration to an interval form of ownership.

11.     Pursuant Section 10 of Article 1 of the Declaration, "'*Unit' means a separate unit delineated as such on the plat and/or plans of 'Hamilton Cove Townhouses'.*"

12.     Pursuant to section l3 of Article I of the Declaration, "'*Interval Ownership' means that form of ownership of a townhouse unit whereby such unit is conveyed for periods of time, the purchaser receiving a defined period for a period of years together with a remainder over in fee*

4

*simple as a tenant in common with all other purchasers of unit weeks in such townhouse unit on the First Sunday in the year 2026 at 4:00 o'clock P.M.*"

13.     Pursuant Section 17 of Article I of the Declaration, "*'Unit Week' means a period interval ownership in a unit committed to interval ownership.*"

14.     Pursuant Section 19 of Article I of the Declaration, "*'Unit committed to interval ownership' means any unit sold under a plan of interval owners.*"

15.     Pursuant Section 16 of Article I of the Declaration, "*'Unit Owner' means one or more person(s), his heirs, successors and assigns, who own or owns a unit or whose leasehold interest or interests in the unit or units extends for the entire balance of the unexpired term or terms.*"

16.     Pursuant Section 18 of Article I of the Declaration, "*'Unit Week Purchaser' means one or more person(s), his heirs, successors and assigns, who shall purchase a unit or unit week(s) in a unit in Hamilton Cove Townhouses.*"

17.     Pursuant Section 5 of Article I of the Declaration, "*'Common Property' or 'Common Area', or 'Common Elements' shall mean those properties defined as such in Article I, Section I(D) of the aforesaid Declaration.*"

18.     Pursuant Section 1 of Article II of the Bylaws, *"All owners of units or unit week(s) within the above Subdivision as now platted or as may be platted will be members of the Hamilton Cove Townhouses Property Owners Association, Inc."* Each owner is referred to herein individually as an "Association Member" and collectively as the "Association Members".

**C.     Property Description.**

19.     The property subject to the Declaration that is governed by the Association, is located at 1125 Dave Creek Parkway, Fairfield Bay, AR 72088 and is commonly known as *Hamilton Cove Townhouses* (the "Property"). The Property consists of 7 buildings containing

1605185568.9

37 Units and their concomitant Common Areas. In addition, the Association owns 8 boat slips at the Dave Creek Slips Association.

20.     The Property is operated as a timeshare community. All Units are fully furnished, and each contains a full kitchen.

21.     The following photographs depict the location of the Property and certain of the buildings at the Property:



1605185568.9





**D.**     **The Master Development.**

22.     The Declaration and the Property are also subject to the provisions of the Declaration of Covenants and Restrictions with Protective Covenants for Fairfield Bay Van Buren and Cleburn Counties, Arkansas recorded on April 29, 1970 in Book 23, Page 249 in the Recorder's Office, as amended by (i) that certain Amendment to Declaration of Covenants and Restrictions recorded on July 23, 1975 in Book 112 at Page 187 in the Recorder's Office and by that certain Supplemental Declaration of Covenants and Restrictions recorded on June 2, 1981 in Book 144 at Page 505 in the Recorder's Office, (ii) that certain Supplemental Declaration of Covenants and Restrictions recorded on September 16, 1981 in Book 147 at Page 431 in the Recorder's Office, (iii) that certain Second Amendment to Declaration of Covenants and Restrictions recorded on October 12, 1982 in Book 157 at Page 293 in the Recorder's Office, (iv) that certain Third Amended

7

and Restated Declaration of Covenants and Restrictions recorded on October 22, 1993 as Document No. 93-4756 in the Recorder's Office, (v) that certain Amendment and Supplement to Third Amended and Restated Declaration of Covenants and Restrictions recorded on September 11, 1997 as Document No. 97-4692 in the Recorder's Office, (vi) that certain Amendment and Supplement to Third Amended and Restated Declaration of Covenants and Restrictions Pursuant to Membership Vote of March 10, 1998 recorded on March 30, 2000 as Document No. 20001582 in the Recorder's Office, (vii) that certain Amendment and Supplement to Third Amended and Restated Declaration of Covenants and Restrictions Pursuant to Membership Vote of July 18, 2003 recorded on August 6, 2003 as Document No. 20034445 in the Recorder's Office, (viii) that certain Amendment and Supplement to Third Amended and Restated Declaration of Covenants and Restrictions recorded on February 24, 2009 as Document No. 20091773 in the Recorder's Office, and (ix) that certain Amendment and Supplement to Third Amended and Restated Declaration of Covenants and Restrictions recorded on August 20, 2009 as Document No. 20097240 in the Recorder's Office Fourth Amended and Restated Declaration of Covenants and Restrictions recorded on September 15, 2023 as Document No. 2023-5125 in the Recorder's Office. The foregoing instruments are collectively referred to as the "Master Declaration". The Master Declaration provides that the Property (*Hamilton Cove Townhouses*) is a subdevelopment within a master development known as *The Bay* a/k/a *Fairfield Bay* (the "Master Development").

23.     Section B(1)(b) of Article III of the Master Declaration also provides that Association Members are also Regular Members-Interval Owners of Fairfield Bay Community Club, Inc. (the "Master Association"). Pursuant to Sections 2 and 3 of Article X of the Master Declaration, the Association Members are obligated to make periodic payments to the Master Association for the "*purpose of promoting the recreation, health, safety, and welfare of the*

8

*Owner(s) of the Properties and in particular for the improvement and maintenance of Properties, services and facilities devoted to this purpose and related to the use and enjoyment of the Common Properties and the improvements situated upon the Common Properties, including but not limited to the payment of taxes and insurance thereon, and construction of capital improvements, repair, replacement, and additions thereto, and for the cost of labor, equipment, materials, management and supervision thereof."* Pursuant to Section 4 of Article X of the Master Declaration, *"[t]he annual Assessment for Living Units committed to Interval Ownership may be fixed at a higher rate than the Assessment for other memberships but shall not exceed two times the Assessment for the highest rate available for regular memberships."* The Association collects those fees assessed by the Master Association from Association Members and remits them to the Master Association.

### E. Ownership Interests of the Property.

24.     The seven (7) buildings in the Hamilton Cove Development were built and added in four phases. Each building contains the following Units:

- Hamilton Cove Phase One:
    - Building 1, Units 1, 2, 3, 4, 5, and 6
    - Building 2, Units 7, 8, 9, 10, and 11
- Hamilton Cove Phase Two:
    - Building 4, Units 17, 18, 19 and 20
    - Building 5, Units 21, 22, 23, 24, 25 and 26
- Hamilton Cove Phase Three:
    - Building 6, Units 27, 28, 29, 30, and 31
    - Building 7, Units 32, 33, 34, 35, 36, and 37
- Hamilton Cove Phase Four:
    - Building 8, Units 38, 39, 40, 41, and 42

25.     Each of the thirty-seven Units at the Property contains fifty-two (52)  Unit Weeks. There are 1,924 Unit Weeks at the Property.

26.     Pursuant to a Special Warranty Deed dated September 3, 2025 and recorded in Book 2025, at Page 3572 on September 12, 2025 in the Recorder's Office, the Association owns one Unit Week in each Unit at the Property as follows:

- Phase One:
    o  Building 1, Units 1, 2, 3, 4, 5, and 6, Week 2
    o  Building 2, Units 7, 8, 9, 10, and 11, Week 2
- Phase Two:
    o  Building 4, Units 17, 18, 19 and 20, Week 2
    o  Building 5, Units 21, 22, 23, 24, 25 and 26, Week 2
- Phase Three:
    o  Building 6, Units 27, 28, 29, 30, and 31, Week 3
    o  Building 7, Units 32, 33, 34, 35, 36, and 37, Week 4
- Phase Four:
    o  Building 8, Units 38, 39, 40, 41, and 42, Week 3

27.     Accordingly, the Association owns 37 Unit Weeks at the Property together with a concomitant share of the common elements (the "Association Interest"). The Association Interest comprises approximately 1.92% of the total Unit Weeks at the Property. The Association owns the Association Interest as a tenant-in-common with all Interval Owners at the Property. The Unit Weeks owned by the Association, are sometimes referred to as maintenance weeks.

28.     PTVO Owners Association, Inc. ("PTVO")[4] owns 1,110 Unit Weeks at the Property, which is approximately 57.69% the total Unit Weeks.

---

[4] Upon information and belief, pursuant to the Declaration of Covenants, Conditions and Restrictions; Grant and Reservation of Easements for Club Wyndham Access Vacation Ownership Plan ("CWA"), dated January 3, 2008, as amended, supplemented or restated from time to time (the "Club Declaration"), PTVO, a non-stock, non-profit corporation duly organized and existing under the laws of the State of Delaware, and Wyndham Vacation Resorts, Inc. created a multi-site timeshare program known as Club Wyndham Access. Upon Information and belief, pursuant to a Declaration of Trust for CWA dated as of January 4, 2008, as amended, supplemented or restated from time to time, (the "Trust Declaration") PTVO and Wyndham Vacation Resorts, Inc. created an irrevocable trust to hold legal title to certain real property interests in one or more resort properties ("Club Properties") that have been subjected to the Club Declaration. Upon information and belief, the Club Properties are deeded to First American Trust, a Federal

29.     Wyndham Vacation Resorts, Inc. ("WVR") owns 239 Unit Weeks, which is 12.42% of the total Unit Weeks at the Property.

30.     The remaining 538 Unit Weeks (approximately 27.96% of the total) are owned by parties to corresponding contracts, with each interval having its own separate corresponding contract.

31.     Upon information and belief, CWA (discussed in footnote 4) has or may offer to acquire certain Interval Owners' interest(s) in the Property, in exchange for certain consideration. Debtor is not and will not be a party to any such transaction.

**F.     The Reserve Study and Occupancy.**

32.     The Property faces challenges related to a decline in occupancy as well as needed repairs, capital improvements and renovations.

33.     Pursuant to the 2025 reserve study received by the Board (the "Reserve Study"), the Property needs repairs, capital improvements, and renovations estimated to cost $2,706,971 in 2026.  A copy of the Reserve Study is attached at **Exhibit "A"** hereto.

34.     Pursuant to the Reserve Study (i) the budgeted annual reserve contribution for the 2025 fiscal year is $848,327.14 or $457.43/unit week for the A/B lock-off units and $443.57 for the two-bedroom units, (ii) the budgeted 2025 reserve funding amount does not adequately fund future projected reserve expenses as the reserve balance, and (iii) to adequately meet future projected reserve expenditures, it will be necessary to increase the budgeted funding amount by 20% in 2026 and then increases of 3% annually from 2027 to 2054.

---

Savings Bank ("First American Trust"). Upon information and belief, First American Trust is the trustee under the Trust Declaration. Upon information and belief, PTVO is a beneficiary under the Trust Declaration.

35.     The total 2025 annual maintenance fee of all Association Members was $2,318,112. The Board forecasts a 20% annual reserve increase for Association Members in 2026 and then 3% thereafter. The 2025 annual maintenance fee was $1,249.96 per interval for the lock off Unit Weeks and $1,212.08 per interval for the 2-bedroom Unit Weeks. The Board forecasts maintenance fees increasing to $1,367.9 per Unit Week for the lock off Unit Weeks owned in 2026 and increasing to $1,326.53 for the 2-bedroom Unit Weeks owned.

36.     In 2024, the occupancy rate at the Property was approximately 45.6%. In 2025, the occupancy rate was approximately 34.2%.

**G.     Maintenance Fee Delinquencies and Foreclosure Status.**

37.     As of December 31, 2025, (i) 129 Interval Owners were not current in the payment of maintenance fees, and (ii) the amount past due to the Association totaled $571,381.17.

38.     The Association has ordinarily utilized outside debt collection service providers to pursue collection of delinquent maintenance fees and will continue to do so in instances beneficial to the bankruptcy estate, in the Board's business judgement.

39.     WVR and the Association are parties to an Inventory Foreclosure Agreement dated January 3, 2011, as amended by the First Amendment to Inventory Foreclosure Agreement dated June 1, 2015 (collectively, the "IFA"). Pursuant to the IFA, the Association engaged WVR to provide assistance in foreclosure proceedings against "Delinquent Owners" (as defined in the IFA). The IFA provides for the assignment by the Association and purchase by WVR of "Delinquent Inventory" (as defined in the IFA) for the purpose of instituting foreclosure proceedings, deed in lieu of foreclosures and similar take-back proceedings. WVR pays for the costs of such foreclosures, deeds in lieu of foreclosures and similar take-back proceedings and in exchange for same title to the Delinquent Inventory is conveyed to WVR. WVR is then obligated to pay the Association the going forward maintenance fees on the Delinquent Inventory conveyed

12

to WVR. The Association retains all rights to collect unpaid obligations from Delinquent Owners that remain from periods prior to title transfer to WVR.

40.     As of December 31, 2025, the Association tendered to WVR accounts of twenty-four (24) Delinquent Owners for the purpose of instituting foreclosure proceedings, deed in lieu of foreclosures and similar take-back proceedings. WVR has five pending foreclosure actions as to these accounts. In light of the bankruptcy filing, the Association intends to dismiss the pending actions, and defer instituting new foreclosure actions, without prejudice to the right of the Association to continue or commence collection and/or foreclosure action against Delinquent Owners and without waiver of any rights or remedies of the Association.

**H.     Management of the Property.**

41.     The Association, through its Board, is responsible for the operation, management and maintenance of the Property. Section 2 of Article III of the Bylaws specifically gives the Board the right to manage the Property, including hiring a management company.

42.     The Association has retained a professional management company for the Property. The Association entered into an Amended and Restated Management Agreement with Wyndham Vacation Management, Inc.[5] ("Property Manager") on January 1, 2025 (the "Management Agreement").

43.     By the Management Agreement, the Association appointed the Property Manager to provide certain services (collectively, the "Services") as manager of the property for a term of five years, which automatically renews for successive five-year periods unless terminated upon

---

[5] Upon information and belief, the Property Manager is an affiliate of WVR (an Association Member). Upon information and belief, both the Property Manager and WVR are indirect subsidiaries of Travel + Leisure Co.

1605185568.9

180 days written notice by either party of its intent not to renew upon the conclusion of the then-current period.

44.     The Services provided by the Property Manager are set forth Paragraph 6 of the Management Agreement and include, (i) maintaining the Association's books and records, (ii) conducting business correspondence on behalf of the Association, (iii) maintaining a master list of owners of interests in the Association, (iv) maintaining the Property and repairing individual units as needed, (v) contracting with vendors and service providers, (vi) entering into any concession, lease, equipment lease, contract, or agreement for the operation of the property use of machinery and equipment of the Association, (vii) purchasing such additional machinery and equipment as reasonably necessary for the maintenance and upkeep of the common elements and the VOI Units, (viii) purchase or contract for services, maintenance, material as it deems advisable, (ix) providing housekeeping services to the Association, (x) hiring and compensating employees working on behalf of the Association, (xi) hiring experts including attorneys, tax consultant, accountants and such other professionals and experts on behalf of the Association, (xii) supervising and performing various financial and accounting services, including management of funds, maintaining bank accounts, coordinating all accounts payable, preparing financial statements and records, processing payroll obligations, reconciling bank statements, developing an annual budget, coordinating the preparation and filing of necessary tax returns, annual audits, and assessment billing and collections, (xiii) obtaining and maintaining all necessary insurance coverage, (xix) reservation, inventory management and owners services, (xx) client services, (xxi) check-in and check-out services, (xxii) IT Services, (xxiii) enforcing rules and regulations, (xxix) attending board meetings and member meetings, and (xxx) compliance with law (the "<u>Services</u>").

45.     The Property Manager passes through to the Association the costs of these Services on a dollar-for-dollar basis, without any markup.

46.     The Property Manager's only compensation is a flat rate "management fee" comprised of "ten (10%) percent of the Common Expenses assessed against the Owners" (the "<u>Management Fee</u>"). The Management Fee is to be paid in twelve equal installments on the first day of each month.

47.     During 2025, the total amount paid under the Management Agreement for services was $217,484.64, or approximately $18,123.72 per month. In 2025, the Association also reimbursed the management company for additional expenses under the Management Agreement in the amount of approximately $24,330.00 per month.

48.     The foregoing contractual arrangement is necessary for Debtor to continue operating, as it does not employ or compensate any employees directly and, therefore, would be unable to continue operations without the benefit of the Management Agreement or Tax Services Agreement. As such, Debtor anticipates continuing to operate under the terms of the foregoing agreements and satisfying the obligations arising thereunder in the ordinary course of its business.

I.      **Other Associations.**

49.     The Association and Mountain Ridge Condominium Council of Co-Owners, Inc., Mountain Meadows Association, Inc., Cliffside Lodge II Council of Co-Owners, Inc., and Fairways Townhouse Association, Inc. (collectively, the "<u>Other Associations</u>") each govern real property within the Master Development, which is subject to the Master Declaration.

50.     Each of the Other Associations are debtors in bankruptcy cases pending before this Court. Upon information and belief, the Association and the Other Associations are not affiliates as defined in Section 101(2) of the Bankruptcy Code.

15

51. Upon information and belief, there are no claims or disputes by or between the Association and any of the Other Associations.

**J. Pre-Petition Resolutions.**

52. In or around September of 2025, the Board received a request from WVR and CWA (on behalf of PTVO) for a special meeting of the Association Members to discuss and vote on whether to authorize the Board to file a chapter 11 bankruptcy case for the Association to, among other things, sell the Property. Combined, those Association Members own approximately seventy percent (70%) of the total Unit Weeks at the Property. In response to the request, and as required by the Bylaws, the Board directed that notice of the special meeting together with a ballot and proxy form be sent to all Association Members.

53. On September 25, 2025, at a duly called and conducted special meeting of Association Members (pursuant to the Bylaws) (the "Membership Meeting"), the requisite number of Association Members voted to authorize the Board to file a chapter 11 bankruptcy petition for the Association to, among other things and subject to Bankruptcy Court approval, market and sell the entire Property, free and clear of the interests of all Association Members, with such interests to attach to the proceeds of sale, subject to distribution pursuant to Bankruptcy Court order.

54. With 1,887 voting interests available and 1,335 or 72% of the voting interests represented in person or by proxy, the Board certified a quorum of at least 10% at the Membership Meeting. At that meeting, Association Members specifically voted to authorize the Board to:

(a) file a chapter 11 bankruptcy case on behalf of the Association – **with 99.93% of the voting interests present at the meeting (in person or by proxy) in favor and .07% of the voting interests not in favor**,

(b) engage professionals as the Board deems appropriate to facilitate the bankruptcy proceeding including, but not limited to, retention of K&L Gates LLP as a bankruptcy counsel, Hilco Real Estate LLC as real estate broker, and such other legal, accounting, financial, restructuring, brokerage, and notice professionals as appropriate – **with 99.93% of the voting interests present at the meeting (in person or by proxy) approving and .07% of the voting interests disapproving**,

(c) suspend operations at the Property for 2026 including (i) suspend occupancy at the resort by members, guests and others as of December 27, 2025 (or shortly thereafter as deemed necessary or proper by the Authorized Persons) without waiver of the right of the Association to re-commence occupancy upon notice to members; (ii) suspend collection of 2026 maintenance fees, without waiver of the right of the Association to later seek payment of such fees and without waiver of member obligations regarding same, upon notice to members; (iii) waive the funding of reserves in the 2026 budget pursuant to applicable provisions of Association governing documents and applicable law; (iv) refund to members 2026 maintenance fees received by the Association, if any, without waiver of the right of the Association to later seek payment of such fees, upon notice to members, and without waiver of member obligations regarding same; (v) immediately suspend reservations (including cancelling any existing reservations with occupancy dates after December 27, 2025) at the resort after December 27, 2025, without waiver of the right of the Association to later accept reservations at the resort upon notice to members; (vi) transfer the balance of reserve funds of the Association as of December 31, 2025, as needed, to pay operating expenses and costs of the Association as set forth in the attached limited operations budget for 2026 or any approved budget for the Association, pursuant

to applicable provisions of the governing documents and applicable law; and/or (vii) take any and all action that they deem necessary or proper regarding the operation and/or management of the Association **with 100% of the voting interests present at the meeting (in person or by proxy) approving and 0.0% of the voting interests disapproving**, and

(d) take certain actions related to the bankruptcy case – **with 100% of the voting interests present at the meeting (in person or by proxy) voting yes and 0.0% of the voting interests voting no**.

55.     A draft of the minutes of the Membership Meeting is attached at **Exhibit "B"** hereto. The draft minutes will be subject to approval at a subsequent Board meeting.

56.     As authorized by the required number of Association Members, the Board and Property Manager have suspended occupancy at the Property by members, guests and others.

**K.     Debtor's Intentions in its Bankruptcy Proceeding.**

57.     Among other things, the Association intends to seek, subject to Bankruptcy Court approval as may be required, certain relief including all or some of the following:

- Judgment against Association Members (by consent or otherwise) authorizing the sale of Debtor's undivided interest in the Property, jointly with the sale of the interests of the Association Members, pursuant to 11 U.S.C. §363(h) and/or other applicable provisions of the Bankruptcy Code. Bankruptcy Code. Debtor reserves the right to seek such relief by filing a lawsuit against Association Members.

- Approval of marketing, bid and sale procedures for the Property.[6]

---

[6] Debtor intends to market the Property together with the properties governed by the Other Associations. Debtor will entertain offers for the Property alone as well as for the sale of the Property together with properties governed by all or some of the Other Associations. Debtor shall evaluate all offers in the context of the best interests of the Debtor and its bankruptcy estate.

- Authorization to sell the Property and all Unit Weeks free and clear of the interests of all Association Members (Debtor and non-debtor), with such interests to attach to the proceeds of sale, subject to distribution by bankruptcy court order in accord with 11 U.S.C. §363(b), (f), (h), (i) and/or (j) and other applicable provisions of the Bankruptcy Code.[7]

- Termination or amendment of the timeshare plan for the Property effective at or prior to closing of the sale of the Property.

- Authorization to assume and assign to a purchaser, or reject and terminate, all executory contracts and unexpired leases to which the Association is a party – at closing.

- Authorization to distribute net sale proceeds (after costs of administration and sale) as well as all remaining property, cash and reserves of the Association pursuant to a confirmed plan of liquidation or other Bankruptcy Court order. Distribution to Association Members may be subject to set-off of amounts owed to the Association for delinquent maintenance fees and/or special assessments.

- Resolution of all claims against the Association.

- Dissolution of the Association following sale and distribution pursuant to a confirmed plan of liquidation or other Bankruptcy Court order.

**L.      Assets and Liabilities of Association.**

58.      Debtor funds its operations through the maintenance fees and assessments from Association Members with various interests in the Property. As set forth in Debtor's Petition and statements and schedules, which the Debtor intends to file in the coming days, the Debtor's assets primarily consist of (i) approximately $3,297,586.76[8] in cash and cash equivalents, (ii) approximately $571,381.17 in accounts receivable (as of December 31, 2025), and (iii) an undetermined value of the Association Interest in the Property.

---

[7] Debtor intends to file a bidding procedures motion, including potentially designating a stalking horse bidder for the Property, as may be appropriate.

[8] Aggregate cash balance as of January 31, 2026.

1605185568.9

59.     Debtor's liabilities generally relate to the maintenance and operation of the Property, including, but not limited to, landscaping, housekeeping, and other general maintenance fees. Debtor has been paying its liabilities in the ordinary course leading up to the Petition Date, and Debtor anticipates paying all claims in full as part of this Chapter 11 Case. As of the Petition Date, Debtor carries no secured debt.

## M.     First Day Motions.

60.     Concurrently with the filing of the Chapter 11 Case and this Declaration, Debtor filed certain First Day Motions[9] seeking orders granting various forms of relief intended to maintain the Property, facilitate the efficient administration of the Chapter 11 Case, and expedite the sale process. I believe that it is critical that the Debtor obtain the relief requested in the First Day Motions. Certain of the First Day Motions request authority to pay prepetition claims against Debtor.

61.     The First Day Motions include the following[10]:

i.     *Debtors' Motion for an Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")*

62.     **Joint Administration Motion**. Through the Joint Administration Motion, Debtor requests entry of an order directing the joint administration of this Chapter 11 Case along with the cases of four related timeshare associations located at the Master Development filed contemporaneously herewith—Cliffside Lodge II Council of Co-Owners, Inc., Mountain Ridge Condominium Council of Co-Owners, Inc., The Mountain Meadows Association, Inc. and The

---

[9] Capitalized terms used but not otherwise defined herein shall having the meanings ascribed to them in the applicable First Day Motion.

[10] I have reviewed each of the First Day Motions filed in this Chapter 11 Case (including the exhibits thereto and supporting memoranda) and incorporate by reference the factual allegations and statements set forth therein. To the extent any factual allegations included in a First Day Motion is not expressly provided herein, such statement is adopted in its entirety and incorporated herein.

Fairways Townhouse Association, Inc. (collectively, with the Debtor, the "Debtors"). The joint administration of the Debtors' respective estates will promote efficiencies and enable all parties in interest to stay apprised of the matters pending before the Court.

63.     I understand that many, if not all, of the motions, applications, hearings, and orders that will arise in connection with the Debtors' cases will request the same relief and affect similar—if not the same—parties in interest. Moreover, it is my understanding that the Debtors each plan to pursue a sale of their respective properties, the marketing and sale of which as a single unit may result in obtaining a higher price than selling the properties separately. Thus, in order to optimally and economically administer the Debtors' cases, the Debtor submits that such cases should be jointly administered under the case number assigned to The Fairways Townhouse Association, Inc. In light of the foregoing, the Debtor respectfully requests that the Joint Administration Motion be granted.

ii.     *Debtor's Motion for Entry of an Order (I) Authorizing Debtors to Suppress Certain Personally Identifiable Information for Individual Creditors, Interval Owners, and Parties in Interest and (II) Limiting Debtors' Noticing Obligations (the "Noticing Motion").*

64.     **Noticing Motion**. Pursuant to the Noticing Motion, Debtor requests authority to (a) suppress certain personally identifiable information for only those creditors and parties in interest that are individual persons (rather than entities or businesses) and (b) limit Debtor's obligations with respect to noticing of pleadings.

65.     I believe it is appropriate to authorize Debtor to suppress from any paper filed with the Court in this Chapter 11 Case, the residential addresses and email addresses of individuals that are creditors, Association Members, and parties in interest, because such disclosure may risk violating applicable privacy laws, exposing Debtor to potential civil liability and significant financial penalties. Pursuant to section 107(c) of the Bankruptcy Code and privacy protection

21

regulations being enacted in key jurisdictions, it is appropriate to authorize Debtor to suppress such information to avoid disclosure and potential liability. Omni Agent Solutions, Inc., Debtor's proposed Claims Agent, shall maintain a list of the suppressed individuals for use by Debtor, the United States Trustee, and the Court, upon request.

66.     Additionally, Debtor seeks establishment of certain proposed notice procedures for notifying creditors and interest holders of the commencement and administration of the Chapter 11 Case. Though Debtor has a relatively small number of creditors, it has hundreds of Association Members with an interest in the Property. In order to alleviate the enormous and costly burden of serving so many parties in interest with each filing (some of which are voluminous), Debtor proposes to create and utilize a Master Service List to serve pleadings and other documents upon parties, including by electronic means where available. The proposed procedures will control over the applicable noticing rules contained in the Bankruptcy Rules and the Local Rules.

67.     Debtor further proposes that all filings be made available to all parties in interest on a public website maintained by the Claims Agent. I believe that this relief requested is in the best interest of Debtor's estate, as it will allow for a more efficient and cost-saving case administration. Debtor will still provide notice to any Affected Party by any particular pleading in addition to the Master Service List, and the Interval Owners have also been noticed of the Chapter 11 Case, as there was a meeting of the Association Members conducted on September 25, 2025 to discuss and vote on authorizing the filing of the Chapter 11 Case.

68.     I believe that the relief sought in the Notice Motion is prudent and in the best interest of Debtor, its estate, and the parties in interest, as each of the requested notice procedures will allow for the efficient and economical administration of the Chapter 11 Case, including by

1605185568.9

reducing administrative costs and ensuring the fair and consistent treatment of all parties' interests and rights.

    iii.    *Debtor's Motion for an Order (I) Authorizing Debtor to (A) Continue to Use Existing Cash Management Systems, (B) Maintain Bank Accounts and Continue Use of Existing Business Forms and Checks, and (C) Honor Certain Related Prepetition and Postpetition Obligations; (II) Determining Compliance with, or Granting a Waiver of, Certain Investment and Deposit Guidelines; and (III) Granting Related Relief (the "Cash Management Motion").*

69.    **Cash Management Motion**. Debtor has filed a motion seeking entry of an order: (a) granting Debtor authority to (i) continue to maintain Debtor's existing cash management system, including without limitation, to continue to maintain Debtor's existing Bank Accounts, as defined in the Cash Management Motion, and business forms and (ii) honor certain prepetition and post-petition obligations related thereto; (b) waiving investment and deposit guidelines of section 345 of the Bankruptcy Code and the *Chapter 11 Guidelines for Debtors in Possession* (the "Guidelines")[11] issued by the Office of the United States Trustee; and (c) providing any additional relief required in order to effectuate the relief requested therein.

70.    Debtor maintains a cash management system in the ordinary course of Debtor's business. The Hamilton Cove Cash Management System is an integrated, centralized system that utilizes four (4) Bank Accounts, across two (2) financial institutions (collectively, the "Banks"), through which Debtor manages cash receipts and disbursements.

71.    These accounts serve specific functions within the Hamilton Cove Cash Management System, including making payments, collecting annual fees from owners, investing

---

[11] Under the Guidelines, a debtor in possession must, among other things, close all existing bank accounts and open new accounts in the name of the debtor-in-possession, establish separate accounts for the payment of taxes and cash collateral/post-petition financing, and obtain new checks and business forms that indicate the debtor's status as a debtor-in-possession. These requirements are designed to provide a clear line of demarcation between prepetition activities and transactions and post-petition activities and transactions, in order to prevent the inadvertent payment of prepetition claims during the pendency of the case.

excess funds, and segregating cash required for certain budgeted payment obligations (*i.e.*, in the Hamilton Cove Reserve Account). Debtor has specific Investment Guidelines with respect to certain Bank Accounts that require investments only in certain, specific, safe investments, with the stated goal of ensuring (a) safety of principal, (b) adequacy of liquidity, and (c) maximization of yields (in order of importance).

72.     The Bank Accounts consist of two accounts with Comerica Bank, N.A. (those being the Hamilton Cove Checking Account and the Hamilton Cove Sweep Account) and two accounts with Ameriprise Financial Services, LLC (those being the Hamilton Cove Reserve Account and Hamilton Cove Investment Account). The account balances in the Hamilton Cove Checking Account and Hamilton Cove Sweep Account, as of January 31, 2026 are $0.00 and $246,067.14, such amounts being below the $250,000 FDIC limit. All funds in the Hamilton Cove Reserve and Investment Accounts are invested in a fund which invests only in government securities, repurchase agreements collateralized solely by government securities and/or cash, and cash.

73.     The Hamilton Cove Cash Management System operates in accordance with ordinary, usual, and essential business practices. Through the Property Manager, Debtor maintains detailed accounting records that track transfers of funds to and from the Bank Accounts as a part of normal operations. The Property Manager will continue these practices during the pendency of this case in order to maintain governance, manage liquidity, and meet court reporting requirements. It is imperative that Debtor be able to continue using the existing Hamilton Cove Cash Management System, as it is designed to ensure (a) the safety of the cash received and (b) the adequate funding of expenses and maintenance as well as taxes. Moreover, Debtor has automated payments scheduled and in place with respect to a substantial portion of its vendor

relationships through the existing Hamilton Cove Cash Management System, and Debtor wishes to maintain its existing accounts with the Banks in order to continue collecting overdue maintenance fees that may come due during the course of the case from delinquent owners. I believe any change to this system, therefore, would cause, at best, immediate disruption Debtors' business as well as unnecessary delays, and, at worst, potential violations of applicable law.

74.     The unique nature of Debtor's business and the regulatory regime under which it exists necessitate the continuation of the Hamilton Cove Cash Management System during the pendency of the Chapter 11 Case. The system is designed specifically to comply with Debtor's obligations as a timeshare association, including to control disbursements and ensure cash is generating as high of a rate of return as possible without risking principal. If Debtor were required to create and implement a new cash management system, its business would be severely disrupted, which would have an adverse impact on Debtor and result in substantial additional costs to the estate.

75.      Debtor seeks a waiver of the Guideline requirements so its business is not disrupted by the need to alter the Hamilton Cove Cash Management System, as it would create an unnecessary administrative burden and expense for the estate, while likely causing delays in the processing of payments.

76.     Debtor requests further relief from the Guidelines to the extent they require Debtor to make all disbursements by check. Debtor must conduct certain transactions by debit, wire, or ACH payments and to deny Debtor the opportunity to do so would interfere with its performance of its contracts and unnecessarily disrupt its business.

77.     I believe the relief requested in the Cash Management Motion is necessary and proper considering the nature of the Hamilton Cove Cash Management System. The system, as

1605185568.9

currently designed, ensures Debtor is able to control its cash inflows and outflows, imposes strict guidelines on Debtor's investments of its cash, and protects the cash that Debtor requires for its continued compliance with law.

      iv.    *Debtors' Application for Entry of an Order Authorizing Debtors to Employ and Retain Omni Agent Solutions, Inc. as Notice, Claims and Solicitation Agent Effective as of the Petition Date (the "Omni Retention Application").*

78.    **Omni Retention Application.** Debtor has filed an application requesting the Court approve Debtor's retention of Omni Agent Solutions, Inc. as its Claims Agent. I believe such relief is prudent in light of the hundreds of parties in interests to whom notices may need to be sent. I believe that the most effective and efficient manner by which to give notice and process claims in the Chapter 11 Case is to engage Omni Agent Solutions, Inc., as an independent third party with significant experience in this role. I believe the relief requested in the Omni Retention Application is in the best interests of Debtor, its estate, and the Association Members.

      v.    *Debtors' Motion an Order Authorizing Debtors to Pay Prepetition Sales, Use, Trust Fund, Property, and Other Taxes and Similar Obligations (the "Tax Motion").*

79.    **Tax Motion**. Debtor requests authority, among other things, to pay, in Debtor's sole discretion and in accordance with past practice, sales, use, trust fund, property, and other taxes, without regard to whether such obligations accrued or arose before or after the Petition Date. I believe the relief requested in the Tax Motion is in the best interest of Debtor's estate, without which, the estate would suffer substantial and irreparable harm.

80.    In the ordinary course, Debtor (a) incurs certain Taxes and Fees to various Taxing Authorities, and (b) is charged amounts for services related to calculating and estimating such Taxes and Fees. As of the Petition Date, Debtor has accrued and outstanding approximately $74,809.56 in tax obligations, of which no amounts are anticipated to come due within the first 30 days after the Petition Date.

81.     Debtor must continue to pay certain of these taxes and fees in order to avoid potential penalties and distractions during the Chapter 11 Case. Debtor's failure to pay the Taxes and Fees described in the Tax Motion could adversely affect Debtor's business, as taxing authorities may assert liens on Debtor's property, assert penalties or interest on past-due amounts, cancel licenses, and/or subject Debtor's directors and officers to personal liability for unpaid amounts. I believe the relief requested in the Tax Motion is required to avoid these potential disruptions and distractions.

vi.     *Debtors' Motion for Authority to (I) Continue to Administer Insurance Policies and Related Agreements; (II) Honor Certain Obligations in Respect Thereof; and (III) for Related Relief (the "Insurance Motion").*

82.     **Insurance Motion**. Debtor has filed a motion requesting the authority but not direction to, among other things, maintain, renew, modify, supplement or purchase, in its sole discretion its Insurance Policies and Programs described therein as well as agreements related thereto.

83.     Debtor's Insurance Policies and Programs are crucial to the preservation of the value of Debtor's business, Property, and estate. In many cases, the insurance coverage is required by law and/or the Office of the United States Trustee. The Insurance Policies and Programs are also prudent to continue, as they ensure the protection of the value of the estate in the event a calamity were to occur. By shifting the risk from Debtor and its interest holders to the Insurance Providers under the existing regime of Insurance Policies and Programs, Debtor can efficiently, and economically, protect the estate and its interests. I believe that it is essential for Debtor to maintain the Insurance Policies and Programs in the ordinary course of business as set forth in the Insurance Motion. Debtor's continued operations, combined with its efforts to undertake an orderly sale of the Property, require that the insurance policies be maintained on an ongoing and

uninterrupted basis. I believe the relief requested in the Insurance Motion is in the best interests of Debtor, its estate, and the Association Members.

**N.      Retention Applications.**

84.      Though not part of the First Day Motions, during the course of the Chapter 11 Case, Debtor intends to retain several professionals, for each of which Debtor will file a separate retention application. In particular, Debtor intends to retain (a) K&L Gates LLP, as general bankruptcy counsel, (b) Wright, Lindsey & Jennings LLP as local and conflicts counsel, and (c) Hilco Real Estate, LLC, as real estate agent to Debtor. Moreover, as noted above, Debtor also seeks to retain Omni Agent Solutions, Inc. as its notice and Claims Agent.

**O.      Reservations and Conclusion.**

85.      Nothing contained in this Declaration, any First Day Motion, or any relief requested in this Declaration or the First Day Motions, is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against Debtor under the Bankruptcy Code or other applicable non-bankruptcy law; (b) an impairment or waiver of Debtor's or any other party in interest's right to dispute any claim against, or interest in, Debtor, its property, or its estate on any grounds; (c) a promise or requirement to pay any claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Declaration, the First Day Motions, or any relief requested therein; (f) an implication, admission, or finding as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on the property of Debtor or its estate; (g) an impairment or waiver of any claims or causes of action which may exist against any entity;

or (h) a waiver of Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

86.     I have consulted with Debtor's proposed counsel regarding the relief requested in the First Day Motions and understand each of the First Day Motions and the relief requested therein. To the best of my knowledge and belief, and subject to the foregoing reservations, the factual statements contained in each of the First Day Motions are true and accurate, and each such factual statement is incorporated herein by reference.

87.     I believe that the relief requested in the First Day Motions is necessary, in the best interests of Debtor's estate, its creditors, the Association Members, and all other parties in interest, and will allow Debtor to operate with minimal disruption and maximize value preservation during the pendency of its bankruptcy case. Failure to grant the relief requested in any of the First Day Motions may result in irreparable harm to Debtor and its estate. Accordingly, for the reasons set forth herein and in each respective First Day Motion, I request that the Court grant the relief requested in each of the First Day Motions.

1605185568.9

I hereby certify that, upon information and belief, the foregoing statements made by me are true and that this Declaration is executed under penalty of perjury. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: February 11, 2026

_/s/ Ladd Marks_____
Ladd Marks
President of the Board of Directors

1605185568.9